**[Cite as *In re I.W.*, 2020-Ohio-1643.]**

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

IN THE MATTER OF: I.W.

:
:
:     Appellate Case No. 2019-CA-76
:
:     Trial Court Case No. 2017-0196
:
:     (Appeal from Common Pleas Court-
:     Juvenile Division)
:
:
:

. . . . . . . . . . .

O P I N I O N

Rendered on the 24th day of April, 2020.

. . . . . . . . . .

JOHN M. LINTZ, Atty. Reg. No. 0097715, Assistant Prosecuting Attorney, Clark County Prosecutor's Office, 50 East Columbia Street, Suite 449, Springfield, Ohio 45502
    Attorney for Appellee, Clark County Department of Job & Family Services

SARA M. BARRY, Atty. Reg. No. 0090909, 111 West First Street, Suite 1150, Dayton, Ohio 45402
    Attorney for Appellant, Mother

. . . . . . . . . . . . .

DONOVAN, J.

{¶ 1} Mother appeals from a judgment of the Clark County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of I.W. to the Clark County Department of Job and Family Services ("DJFS").

{¶ 2} I.W. was born on February 8, 2017; Mother and Father were not married. When Mother was admitted to a hospital to deliver I.W., she had black eyes, bruises on her arms, and burns on her back, arms, and legs. Mother also had a possible concussion with associated memory loss and black outs. Mother informed hospital staff that she had recently been in an automobile accident. According to hospital personnel, Mother was also forgetting to feed and change I.W. after she was born.

{¶ 3} On February 10, DJFS received a referral that Mother had tested positive for benzodiazepines, but I.W. had tested negative. Mother denied any drug use. Hospital personnel reported that Father arrived at the hospital shortly after I.W. was born, with his other girlfriend, to visit his child. Both Father and the girlfriend stayed overnight with Mother and I.W. in their hospital room. Father and the girlfriend were eventually removed from the hospital due to their behavior in Mother's hospital room.

{¶ 4} On February 13, 2017, Mother reported to hospital staff that she had not been in a car accident, but that Father had caused all of her injuries prior to the birth of I.W. by punching her in the face, kicking her, and stomping on her. Mother reported that Father had also poured hot grease on her, causing the burns all over her body. The police were contacted and, based on Mother's allegations, the Springfield Police Department issued a warrant for Father's arrest.[1] Even after she had been advised not to do so, Mother

---

[1] Father was eventually arrested and later convicted of felonious assault, domestic violence, and abduction for his conduct toward Mother while she was pregnant with I.W. Father is scheduled to be released from prison in 2038. His appeal from his conviction is

remained in contact with Father via telephone.

{¶ 5} Based on these facts, on February 15, 2017, DJFS filed a complaint asking the trial court to find I.W. dependent. Mother and I.W. were then sent from the hospital to live at Project Woman, a program for battered women in Clark County, and to not have any contact with Father. Mother was also informed that she could retain custody of I.W. as long as she remained at Project Woman and did not leave without giving seven days' notice.

{¶ 6} While the exact dates are unclear, the record establishes that Mother remained at Project Woman for approximately one month before she left with I.W.; she did not provide seven days' notice to DJFS of her departure. Mother later testified that she felt that the atmosphere at Project Woman was unsafe for herself and I.W., that her money and clothes were being stolen, and that I.W.'s food was being stolen. Upon leaving Project Woman, Mother took I.W. and went to stay with I.W.'s paternal grandparents. Thereafter, on March 14, 2017, DJFS received ex parte custody of I.W.; on March 15, 2017, it was converted to shelter care custody. Mother admitted that during the initial months after I.W.'s removal from her custody, she made no progress toward reunification with her child because she was continuously moving around in an effort to avoid being subpoenaed to testify against Father in his criminal trial. Mother did not attempt to have any contact with I.W. from March 15, 2017, until July 26, 2017.

{¶ 7} On July 26, 2017, DJFS filed a case plan requiring Mother to complete the following actions in order to facilitate reunification with I.W.: 1) undergo a mental health assessment and follow through with its recommendations; 2) undergo a parenting

currently pending in this court.

psychological examination and follow through with its recommendations; 3) attend a survivor's support group, learn new coping skills, and address personal goals; 4) attain and maintain stable housing apart from her mother; 5) maintain stable employment in order to meet I.W.'s basic needs; 6) attend DJFS monthly meetings and be honest regarding case plan progress; and 7) communicate transportation needs to her social worker.

{¶ 8} On November 28, 2017, the magistrate found I.W. to be dependent and granted temporary custody of the child to DJFS until May 13, 2018. Temporary custody was later extended until February 2019. On December 20, 2017, DJFS filed another case plan for Mother containing the same requirements as her first case plan. On March 1, 2018, Maternal Grandmother filed a motion for legal custody of I.W..

{¶ 9} DJFS filed a motion for permanent custody of I.W. on January 29, 2019. On March 13, 2019, Mother filed a motion requesting permanent custody of I.W., or in the alternative, that permanent custody of I.W. be awarded to the paternal grandparents.

{¶ 10} In order to decide the matter, the first of two evidentiary hearings was held on April 2, 2019; on that date, the magistrate heard the testimony of Mother's psychotherapist at Wellspring Mental Health, Barbara Ofzky, and of Mother's caseworker at Clark County DJFS, Tiffany Wright. At the second evidentiary hearing held on June 4, 2019, the magistrate heard the testimony of Jerome Kynard, the visitation program specialist at DJFS, and Mother's testimony on her own behalf.

{¶ 11} On July 19, 2019, the magistrate issued a decision granting permanent custody of I.W. to DJFS and terminating the parental rights of both Mother and Father. On July 25, 2019, Mother filed an objection to the magistrate's decision. On August 9,

2019, the magistrate issued an amended decision granting permanent custody of I.W. to DJFS, and on September 4, 2019, Mother filed an objection to the magistrate's amended decision, essentially repeating the argument in her prior objection that the magistrate's decision was against the manifest weight of the evidence.

{¶ 12} On October 15, 2019, the trial court overruled Mother's objections and adopted the magistrate's decision in its entirety, thereby awarding permanent custody of I.W. to DJFS and terminating the parental rights of Mother and Father.

{¶ 13} It is from this decision that Mother now appeals.[2]

{¶ 14} Mother's sole assignment of error is as follows:

THE TRIAL COURT ERRED IN FINDING THERE WAS CLEAR AND CONVINCING EVIDENCE THAT PERMANENT CUSTODY WAS IN THE BEST INTERES[T] OF THE CHILD.

{¶ 15} Mother contends that the trial court's judgment awarding permanent custody of I.W. to DJFS was not supported by clear and convincing evidence.  Mother also argues that the record established that it was in the best interest of I.W. for permanent custody to have been awarded to her.

{¶ 16} The United States Supreme Court has described the interest of parents in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).   The Ohio Supreme Court has recognized that "there is an essential and basic civil right to conceive and raise children." *In re K.H.*, 119 Ohio St.3d

---

[2] At all relevant times during these proceedings, Father was in jail awaiting trial or was incarcerated in prison after being convicted of the crimes he committed against Mother. He is not involved in the instant appeal.

538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 39. However, "[t]he fundamental interest of parents is not absolute." *In re D.A.*, 113 Ohio St.3d 88, 2007-Ohio-1105, 862 N.E.2d 829, ¶ 11. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380 ¶ 58 (O'Connor, C.J., dissenting), citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28.

{¶ 17} The termination of parental rights is governed by R.C. 2151.414. Division (B)(1) of that statute requires a court to determine, "by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody," and that certain other conditions apply. Clear and convincing evidence has been defined as " 'that measure or degree of proof which is more than a mere "preponderance of the evidence," but not to the extent of such certainty as is required "beyond a reasonable doubt" in criminal cases,' " and which will produce in the mind of the trier of fact " 'a firm belief or conviction as to the facts sought to be established.' " *In re K.H.* at ¶ 42, quoting *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus.

{¶ 18} A court's decision to terminate parental rights will not be overturned "if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citations omitted.) *In re A.U.*, 2d Dist. Montgomery No. 22264, 2008-Ohio-186, ¶ 15. "We review the trial court's judgment for an abuse of discretion." *In re L.C.*, 2d Dist. Clark No. 2010 CA 90, 2011-Ohio-2066, ¶ 14, citing *In re C.F.* at ¶ 48 (applying the abuse-of-discretion standard to trial court's findings under R.C.

2151.414).

{¶ 19} A two-part test applies to determine whether to grant a public children services agency's motion for permanent custody. R.C. 2151.414(B)(1) provides that a court may grant permanent custody if it clearly and convincingly finds that (1) the child's best interest lies in granting permanent custody to the agency, and (2) any of the statutory alternatives apply.

{¶ 20} R.C. 2151.414 provides in relevant part as follows:

(B)(1) Except as provided in division (B)(2) of this section, the court may grant permanent custody of a child to a movant if the court determines at the hearing held pursuant to division (A) of this section, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody and that any of the following apply:

(a) The child is not abandoned or orphaned, has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or has not been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period if, as described in division (D)(1) of section 2151.413 of the Revised Code, the child was previously in the temporary custody of an equivalent agency in another state, and the child cannot be placed with either of the child's parents within a reasonable time or should not be placed with the child's parents.

{¶ 21} In determining a child's best interest, R.C. 2151.414 instructs courts to consider "all relevant factors," including five statutory factors:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers, out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

R.C. 2151.414(D)(1). "No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶ 22} R.C. 2151.414 further provides:

(E) In determining at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the Revised Code whether a child cannot be placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, at a hearing held pursuant to division (A) of this section or for the purposes of division (A)(4) of section 2151.353 of the

Revised Code that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent:

(1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.

{¶ 23} Initially, we note that at the time first evidentiary hearing on April 2, 2019, I.W. had been in the custody of DJFS for approximately 24 months, which is clearly more than 12 months out of a consecutive 22-month timeframe. Accordingly, the only issue before the court was whether the State presented clear and convincing evidence supporting the trial court's finding that it was in I.W.'s best interest to be placed in the permanent custody of DJFS.

{¶ 24} As previously stated, just two days after giving birth to I.W., DJFS was notified that Mother had tested positive for benzodiazepines and was forgetting to feed

and change her baby. I.W. could not be released into the custody of Father, since he had a history of domestic violence and was staying in Mother's hospital room after the birth of his daughter. Father and his girlfriend were eventually removed from the hospital room after Mother informed hospital staff that the extensive physical injuries with which she initially presented had not been caused by a car accident, but that Father had beaten her and burned her with hot grease.

{¶ 25} When Mother was discharged from the hospital, she was allowed to maintain custody of I.W. only if they lived in Project Woman housing. Additionally, Mother was required to provide DJFS with seven days' notice if she were planning to leave Project Woman. Nevertheless, Mother left Project Woman without providing the requisite notice to DJFS. As a result, I.W. was taken from Mother and placed in the temporary custody DJFS on March 14, 2017. Mother admitted that, during the initial months after I.W.'s removal from her custody, she made no progress toward reunification with her child because she was continuously moving around in effort to avoid being subpoenaed to testify against Father in his criminal trial. Mother did not attempt to have any contact with I.W. from March 15, 2017, until July 26, 2017.

{¶ 26} On July 26, 2017, DJFS filed a case plan which required Mother to do the following in order to facilitate reunification with I.W.: 1) undergo a mental health assessment and follow through with its recommendations; 2) undergo a parenting psychological examination and follow through with its recommendations; 3) attend a survivor's support group, learn new coping skills, and address personal goals; 4) attain and maintain stable housing apart from her mother; 5) maintain stable employment in order to meet I.W.'s basic needs; 6) attend DJFS monthly meetings and be honest

regarding case plan progress; 7) communicate transportation needs to her social worker. Based upon the testimony provided by the witnesses at the permanent custody hearings, Mother did not substantially complete her case plan objectives.

**{¶ 27}** , Barbara Ofzky, a psychotherapist at Wellspring who treated Mother from October 2018 through March 2019, testified that out of 32 scheduled appointments, Mother missed 12 of them (nine canceled, three no shows). Although Mother rescheduled some of the missed appointments, the record is unclear how many she rescheduled and/or how many of the rescheduled appointments she actually attended. Ofzky testified that she had treated Mother for post-traumatic stress disorder related to the physical and mental abuse she suffered at the hands of Father. Ofzky further testified that the treatment sessions ended when Mother moved away from Clark County to Montgomery County and then claimed that she did not have transportation to travel back to Wellspring. Ofzky noted that Mother had been informed that she could obtain transportation to continue her treatment from a service called RidesPlus. Mother had not re-enrolled in counseling at the time of the permanent custody hearings.

**{¶ 28}** Mother's caseworker, Tiffany Wright, also testified regarding her progress with respect to the case plan. Wright testified that Mother had ceased attending her Project Woman support group in violation of her case plan. Significantly, at the time of the hearings, Mother was living with I.W.'s paternal grandparents and had yet to establish independent housing. Mother was complying with the case plan insofar as she was not living with her own mother; however, Wright testified that the living conditions at paternal grandparents' residence were less than ideal. Specifically, Wright testified that during a home visit at the paternal grandparents' house, she observed many cockroaches inside

the residence. Wright testified that, "[a]t one point, there was actually one crawling on my chest when I was talking with [Mother], and I just plucked it off and just kept going. April 2, 2019 Tr. 32. Wright also testified that she observed cockroaches on the curtains, floors, and bedding at the paternal grandparents' residence. Based upon her observations, Wright indicated that the home-study did not pass. Thus, the record establishes that while DJFS attempted to find relative placements for I.W., the attempts were unsuccessful.

{¶ 29} Furthermore, Mother testified that she had lived at four or five different residences during the pendency of the case, including her own subsidized apartment, Project Woman housing, her own mother's residence, and the home of I.W.'s paternal grandparents. Mother testified that she had almost been able to obtain independent housing, but the apartment company could not rent to her because she had misinformed the company that she had custody of I.W. when, in fact, she did not.

{¶ 30} The record also establishes that throughout the duration of these proceedings, Mother was not consistently employed. Mother testified that, upon moving to Dayton, Ohio, in January 2019, she was initially employed at StaffMark, a temporary employment agency. Although she reported to DJFS that she was employed full-time at McDonald's restaurant, she could verify only that she was working between 15 and 18 hours a week. Additionally, Mother testified that she was unable to provide health insurance for I.W. and was not familiar with the process she would have to follow in order to get health insurance for her child. Mother testified that she had applied for health benefits for I.W. in Clark County using her mother's Springfield address. However, Mother acknowledged that she had lied on the application because, at the time, she was

living at I.W.'s paternal grandparents' residence in Dayton, thus rendering her ineligible for health insurance for I.W. through Clark County.

{¶ 31} While Mother did eventually complete a mental health assessment in accordance with her case plan, she waited approximately a year and a half before submitting to the assessment. Another objective of Mother's case plan was to complete a parenting psychological examination. While the record establishes that Mother did eventually attend the examination, she missed her first appointment. After rescheduling, Mother then missed her second appointment. Mother finally completed the parenting examination at her third appointment. Additionally, Jerome Kynard, the visitation program specialist at DJFS, testified that Mother was consistent in visiting with I.W. at the DJFS visitation center and that he considered their bond to be "normal." June 4, 2019 Tr. 13. Significantly, however, Kynard testified that Mother's visitations with I.W. never progressed beyond supervised visitation at the DJFS visitation center. Kynard testified that the failure to progress to unsupervised visitation occurred because of Mother's failure to obtain appropriate independent housing for herself and I.W.

{¶ 32} The record establishes that DJFS made every effort to reunite Mother with I.W. Mother's failure to complete the case plan, however, established that she was either unwilling or incapable of adequately caring for I.W. Notably, the guardian ad litem also recommended that DJFS be awarded permanent custody. Accordingly, we find that the trial court did not err when it found that clear and convincing evidence was adduced at the permanent custody hearings which supported its decision to award permanent custody of I.W. to DJFS and terminate Mother's parental rights.

{¶ 33} Finally, we note that at the time of the permanent custody hearings, I.W.

had been living with the same foster parents for the vast majority of her life. I.W.'s foster parents, the only consistent caregivers she had ever known, indicated to DJFS that they were willing to adopt her. In our view and in light of the foregoing, it would clearly not be in I.W.'s best interest to remove her from her foster parents, where she is being raised and adequately provided for in an appropriate environment.

{¶ 34} Mother's sole assignment of error is overruled.

{¶ 35} Mother's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and WELBAUM, J., concur.

Copies sent to:

John M. Lintz
Sara M. Barry
Richard Barnes, Jr.
Lisa Niles
Hon. Katrine Lancaster