[Cite as *In re R.R.*, 2021-Ohio-3523.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY**

|  |  |  |
|---|---|---|
| IN RE: R.R. & C.R. | : | |
| | : | |
| | : | Appellate Case No. 2021-CA-18 |
| | : | |
| | : | Trial Court Case Nos. 21930077 & |
| | : | 21930078 |
| | : | |
| | : | (Juvenile Appeal from |
| | : | Common Pleas Court) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on the 1st day of October, 2021.

. . . . . . . . . . .

RICHARD L. KAPLAN, Atty. Reg. No. 0029406, P.O. Box 751192, Dayton, Ohio 45475
    Attorney for Appellant, Mother

AUTUMN H. WHITE, Atty. Reg. No. 0088672, Miami County Prosecutor's Office, Safety
Building, 201 West Main Street, Troy, Ohio 45373
    Attorney for Appellee, CPS

. . . . . . . . . . . . .

EPLEY, J.

{¶ 1} Mother, the biological mother of R.R. and C.R., appeals from a judgment that awarded permanent custody of R.R. and C.R. to Miami County Child Protective Services (CPS). For the reasons that follow, the judgment of the trial court will be affirmed.

## I.       Facts and Procedural History

{¶ 2} R.R. and C.R. were born to Mother and Father (who is not a party to this appeal) in February 2011 and April 2012, respectively. At the time this case began, the children were in the care and custody of Mother; Father resided in a nursing home due to physical and mental limitations.

{¶ 3} CPS became involved with R.R. and C.R. after Piqua police responded to Mother's residence in January 2019 on a report that a child was locked in a detached garage in the middle of the night screaming "Mommy, let me in, I'm cold!" When officers arrived, they found C.R. locked in the detached garage (although during her testimony Mother described the structure as a barn) with the temperature near zero.

{¶ 4} Mother admitted to police that C.R. had been locked in the garage as punishment for urinating in his pants. She also stated that her boyfriend had shot C.R. with a BB gun. Upon examination of the boy, officers discovered a welt on his leg that looked like a fresh BB mark. Piqua police reported that the conditions inside the home were unsafe for children; roaches were crawling around, bedbugs were present, and trash was everywhere.

{¶ 5} Both Mother and her boyfriend were arrested. Mother was charged with child endangering and assault. Ultimately, she pled guilty to child endangering and was placed on probation. The boyfriend spent time in jail for the assault on C.R.

{¶ 6} On February 25, 2019, CPS filed a complaint in the Miami County Common Pleas Court, Juvenile Division, alleging that R.R. and C.R. were abused, neglected, and/or dependent children. Mother acknowledged her legal rights the next day, and on February 28, 2019, the children were placed into the interim temporary custody of CPS. On March 27, 2019, after an adjudicatory hearing, R.R. and C.R. were found to be dependent under R.C. 2151.04(C). A dispositional hearing was held on April 24, 2019, and a case plan was created to facilitate reunification of Mother with her children.

{¶ 7} The case plan had the following requirements: (1) ensure there is no drug use in the home; (2) comply with mental health treatment; (3) comply with case management services; (4) maintain clean, stable housing; (5) maintain taxable employment; and (6) comply with drug screens.

{¶ 8} Temporary custody was granted to CPS on May 5, 2019. From May until September 2019, Mother had supervised parenting time with the children every other week; those visits, however, ceased on September 26, 2019.

{¶ 9} Mother was not making sufficient progress on the reunification plan, so on March 6, 2020, nearly a year after temporary custody was awarded to CPS and the case plan was put in place, a first extension of temporary custody of R.R. and C.R. was granted to CPS. Later that spring, a revised case plan was filed with the court. The objectives of the plan remained the same, but two additional requirements were included: (1) R.R. and C.R. were not to be exposed to any violence or violent persons; and (2) Mother was to attend and participate in family therapy with Angie Gehret, the children's therapist, when recommended.

{¶ 10} On July 24, 2020, CPS filed a motion to change the disposition from

temporary custody of R.R. and C.R. to permanent custody. The memorandum in support asserted that granting CPS permanent custody of the children was in their best interest and that, in accordance with R.C. 2151.413(D)(1), R.R. and C.R. had been in the temporary custody of CPS for 12 or more months of a consecutive 22-month period. Further, CPS alleged that the children could or should not be placed with either parent within a reasonable amount of time pursuant to R.C. 2151.414(E)(1).

{¶ 11} A trial was held on the permanent custody motion on November 4, 2020. The magistrate heard testimony from Mother, Father, psychologist Dr. Fred Sacks, Kimberly Antonides – therapist at Recovery and Wellness in Tipp City, Angie Gehret, and Julie Tipton – CPS caseworker. On November 19, 2020, after considering the witness testimony and volumes of exhibits, the magistrate granted permanent custody to CPS and terminated Mother's parental rights.

{¶ 12} Mother filed objections to the magistrate's decision on December 1, 2020, but on April 23, 2021, the trial court overruled the objections and affirmed the magistrate's decision to grant CPS permanent custody of R.R. and C.R. The court found by clear and convincing evidence that the children had been in the temporary custody of CPS for 12 or more months of a consecutive 22-month period and that permanent custody was in the best interest of the children.

{¶ 13} Mother has filed a timely appeal.

## II.     The trial court did not abuse its discretion

{¶ 14} Mother raises two related assignments of error. In her first assignment of error, she asserts that the trial court erred when it permanently removed R.R. and C.R.

from her care because there was insufficient evidence to demonstrate that removal was in their best interest. Mother's second assignment of error argues that the evidence used to support the termination of her parental rights was "incomplete, arbitrarily [sic], and the decision as a whole was an abuse of discretion." Appellant's brief at 13. Because of the similar nature of the arguments, we will address them together.

{¶ 15} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 16} Because awarding permanent custody is a "drastic remedy that involves the termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence." (Citations omitted.) *Id.* "Clear and convincing" means more than a preponderance, but less than "clear and unequivocal." *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.).

{¶ 17} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives above to take permanent custody; or (d) has been in the temporary custody of a public or private children services agency for 12 or months of a consecutive

22-month period. *In the Matter of I.W.*, 2d Dist. Clark No. 2019-CA-76, 2020-Ohio-1643, ¶ 20; R.C. 2151.414. If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In the Matter of J.N.* at ¶ 26; R.C. 2151.414(B)(1).

{¶ 18} To assist with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶ 19} Once a decision is made regarding permanent custody of a child, an appellate court will not reverse absent an abuse of discretion. *In the Matter of J.N.* at ¶ 22. The term "abuse of discretion" implies the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140

(1983). "[T]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.*

{¶ 20} Here, the trial court determined by clear and convincing evidence, in satisfaction of R.C. 2151.44(B)(1)(d), that R.R. and C.R. had been in the temporary custody of CPS for 12 or more months of a consecutive 22-month period. CPS was granted temporary custody of the children on May 8, 2019 and they remained in the agency's custody even after the motion for permanent custody was filed on July 24, 2020 – a span of approximately 14 months. Because of this determination, CPS did not have to demonstrate that R.R. and C.R. could not or should not be returned to Mother within a reasonable amount of time. R.C. 2151.44(B)(1)(a). Mother concedes that the children were in the custody of CPS for the requisite amount of time. The court's analysis, therefore, focused solely on whether a grant of permanent custody to CPS was in the best interest of R.R. and C.R.

{¶ 21} When determining the best interest of the child, the court must consider all relevant factors, including those found in R.C. 2151.414(D). The first factor to consider is the interaction and interrelationship of the children with their parents, relatives, foster parents, and any other person who may significantly affect the child.

{¶ 22} The record indicates that the relationship between Mother and R.R. and C.R. has been, and will continue to be, strained. As stated earlier, CPS became involved with the children after Mother allowed C.R. to be locked in a freezing cold garage in the middle of the night because he wet his pants. She also permitted her boyfriend to shoot him with a BB gun. In fact, the record reflects that Mother not only encouraged it, but laughed. Both children also reported being locked in closets. This type of documented behavior by Mother had led to feelings of distrust and anxiety from the children. Further, Mother's relationship with her boyfriend amplified those feelings; both children reported intense fear of the boyfriend, and there were allegations in the record of physical and sexual abuse by the boyfriend.

{¶ 23} The fear and anxiety manifested in the children's reactions to having supervised visitations with Mother. Angie Gehret, the children's therapist, testified that visitations with Mother were difficult for R.R. and C.R. "[The visits] were very emotional for the kids," Gehret stated. "[W]e would see a behavioral spike of negative behavior, especially for R.R. after visitation[.] * * * [T]owards the end of July I was asked to talk to the kids about how would they feel about visitation off-site and both kids had said although they would like to see [Mother], they didn't want it off-site, they were worried that she would hurt them and they only felt safe if * * * Children's Services were there to supervise. * * * [O]riginally they were happy to see [Mother], they absolutely didn't want any contact with [the boyfriend]. * * * [A]s time went on, they both expressed more and more fear about visitation and their mental health after visitations would deteriorate." Trial Tr. at 162.

{¶ 24} The anxiety about visits got so severe that on September 30, 2019, Gehret sent an unsolicited letter to CPS recommending that visitations with Mother be

immediately suspended. R.R. was in such dire shape due to anxiety surrounding visits that Gehret believed R.R. would need to be hospitalized. The visits were stopped, and for a time, at least, the children improved.

**{¶ 25}** Gehret was not the only professional who recommended visitations stop. Mother was referred by CPS to Dr. Fred Sacks, an independent psychologist. He testified that he met with Mother for a total of 12 hours and ran several "gold standard" tests, diagnosing her with major depressive disorder, post-traumatic stress disorder, borderline personality disorder, and unspecified somatic symptom disorder. He stated at trial that the test results demonstrated an overall response bias, which gave him concerns about her forthrightness and honesty. She was, according to the doctor, "artfully avoidant" regarding the issues surrounding the case and minimized her responsibility and wrongdoing. When she did discuss the incident with C.R., it was done with little emotional expression and detachment. Dr. Sacks testified that Mother exhibited no insight into how the situation could have affected her son and showed no empathy.

**{¶ 26}** In his report, Dr. Sacks noted that Mother "appears to be in substantial denial of her psychological limitations and, moreover, it appears that she is in some massive denial of her limited capacity to be protective of her children's safety." He testified that "she gave me no indications that she needed to reform." Dr. Sacks ultimately concluded that Mother "should not be provided the opportunity to have continuing responsibilities as a parent to her children."

**{¶ 27}** Overall, the record shows the children's interactions and interrelationship with Mother were problematic and strained.

**{¶ 28}** R.R. and C.R., though, had a positive relationship and interactions with their

father, visiting him in the nursing home monthly, but his medical and residential situations made it impossible to place the children with him. Gehret, though, testified that she had no problem with the children visiting their father in the future.

{¶ 29} According to the record, the strongest relationship the children had was with their foster mother.

{¶ 30} The next factor to consider was R.C. 2151.414(D)(1)(b), the wishes of the children. In this case, the record is replete with evidence and testimony that both R.R. and C.R. did not wish to be placed with Mother, but rather ed to stay with their foster family. For instance, Gehret testified that R.R. would oftentimes say that she hated her mother and never wanted to see her. Gehret also noted that R.R. very much wanted to live with her foster mother. Likewise, Gehret testified that C.R. had stated that he sometimes missed Mother but did not want to live with her. Instead, he wanted to live with his foster mother forever. According to the CASA report, when asked where he wanted to live, C.R. responded, "at my foster mother's home because it's my real home." The record is clear that the children did not wish to live with Mother.

{¶ 31} R.C. 2151.414(D)(1)(c) considers the custodial history of the children. Here, it was undisputed that both children were removed from Mother's custody on an interim basis on February 28, 2019, and then CPS was granted custody on a temporary basis on May 8, 2019. R.R. and C.R. had been in the temporary custody of CPS for 12 or more months of a consecutive 22-month period.

{¶ 32} The next factor, the children's need for a legally secure permanent placement and whether that type of placement could be achieved without a grant of permanent custody to the agency, weighed in favor of permanent CPS custody.

Concretely, the mental health professionals at trial testified that both Mother and Father were unsuitable permanent placements for R.R. and C.R. In addition, Mother had failed to take any responsibility for the dangerous situation C.R. had been placed in, failed to complete the case plan required for reunification, and, evidently, had not completely broken off the relationship with her boyfriend. Father, while having a loving, positive relationship with the children, was unable to care for them due to physical and mental limitations. In short, neither biological parent was suitable for permanent placement. There was also testimony that CPS had contacted other relatives of the children to gauge their interest or ability to care for them long-term, but the relatives were either unwilling or unable to care for R.R. and C.R. on a permanent basis. Based on that, the trial court reasonably found that the only way to achieve the necessary permanency was through a grant of permanent custody to CPS.

{¶ 33} The trial court did not find that any factors in R.C. 2151.414(E)(7) through (11) were applicable.

{¶ 34} After considering the requisite factors, the trial court found by clear and convincing evidence that it was in the best interest of R.R. and C.R. to grant permanent custody to CPS and to divest Mother of all parental rights. The court's 21-page decision was detailed, analyzed all the needed factors, and was reasonable. Based on a thorough review of the record and the discussion above, we cannot say the trial court abused its discretion.

{¶ 35} The first and second assignments of error are overruled.

### III.  Conclusion

{¶ 36} The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

TUCKER, P. J. and DONOVAN, J., concur.

Copies sent to:

Richard L. Kaplan
Autumn H. White
Laura L. Hornish
Kelly M. Schroeder
Larry Salyer, CASA
Heather M. Duwel-Mehl, GAL
Hon. Scott Altenburger