**[Cite as *In re A.B.*, 2023-Ohio-326.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| IN RE: A.B. & A.B. | : | |
| | : | |
| | : | C.A. No. 29598 |
| | : | |
| | : | Trial Court Case No. G-2018-006197- |
| | : | 0F,0L; G-2018-006198,0H,0M |
| | : | |
| | : | (Appeal from Common Pleas Court- |
| | : | Juvenile Division) |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on February 3, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by RICKY L. MURRAY, Attorney for Appellee

MISTY M. CONNORS, Attorney for Appellant

. . . . . . . . . . . .

EPLEY, J.

{¶ 1} The biological mother ("Mother") of A.B.1 and A.B.2 appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, that awarded permanent custody of A.B.1 and A.B.2 to Montgomery County Children Services ("MCCS"). For the reasons that follow, the judgment of the trial court will be affirmed.

## I.      Facts and Procedural History

{¶ 2} A.B.1 and A.B.2 were born to Mother and Father (who is not a party to this appeal) in October 2016 and October 2017, respectively. At the time this case began, the children (along with two older siblings – L.J. and D.J.) were in the care and custody of Mother.

{¶ 3} MCCS became involved with A.B.1 and A.B.2 in late 2018 after receiving a referral that Mother had failed to take A.B.2 to follow-up medical appointments after the boy had surgery. A few months later, another referral was made, again alleging medical neglect, and also raising concerns about housing stability. In January 2019, MCCS was granted temporary custody of A.B.2, and by March 2019, temporary custody of A.B.1 was granted to MCCS. At that time, the older children were removed from Mother's care and placed with foster families as well.

{¶ 4} A case plan was created to facilitate reunification and had the following objectives: (1) obtain stable housing; (2) maintain a stable income; (3) complete a mental health assessment; (4) complete "batterer's intervention;" (5) sign releases of information; (6) complete visitation with the children; (7) submit to a parenting evaluation and follow any recommendations; and (8) submit to a psychological evaluation and follow any recommendations. Despite Mother's compliance and progress with the reunification plan, on December 18, 2020, MCCS filed for permanent custody of A.B.1, A.B.2, and D.J. It did, however, file a motion for the reunification of Mother and L.J.

{¶ 5} The permanent custody hearing was held on November 9, 2021. During the proceeding, the magistrate heard testimony from Kerri A., the foster mother of A.B.1 and

A.B.2, Dr. Richard Bromberg, a clinical psychologist who interviewed Mother, Nakeyia Allen, the family's case worker, and Mother. On December 17, 2021, after considering the witness testimony (no exhibits were presented), the magistrate granted permanent custody of A.B.1 and A.B.2 to MCCS and terminated Mother's parental rights. L.J. and D.J. were reunited with Mother.

{¶ 6} Mother filed objections to the magistrate's decision on January 3, 2022 and supplemental objections on July 14, 2022. The trial court overruled the objections on August 26, 2022, finding by clear and convincing evidence that A.B.1 and A.B.2 had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period and that permanent custody was in the best interest of the children.

{¶ 7} Mother has filed a timely appeal.

## II. The trial court did not abuse its discretion

{¶ 8} Mother raises a single assignment of error: the trial court abused its discretion when it granted MCCS permanent custody of A.B.1 and A.B.2. We disagree.

{¶ 9} The United States Supreme Court has described a parent's rights in the care, custody, and control of her children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 10} Because awarding permanent custody is a "drastic remedy that involves the

termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence." (Citations omitted.) *Id*. "Clear and convincing" means more than a preponderance, but less than "clear and unequivocal." *In re Rose*, 2017-Ohio-694, 85 N.E.3d 498, ¶ 19 (2d Dist.).

{¶ 11} R.C. 2151.414 sets forth a two-part analysis for courts to consider when determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives able to take permanent custody; or (d) has been in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. *In re I.W.*, 2d Dist. Clark No. 2019-CA-76, 2020-Ohio-1643, ¶ 20; R.C. 2151.414(B)(1).

{¶ 12} If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In re J.N.*, 2d Dist. Clark No. 2019-CA-82, 2020-Ohio-4157, ¶ 26; R.C. 2151.414(B)(1). To help with this determination, R.C. 2151.414(D)(1) lists factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶ 13} Once a decision is made regarding permanent custody of a child, an appellate court will not reverse absent an abuse of discretion. *In re J.N.* at ¶ 22. The term "abuse of discretion" implies the court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983). "[T]he discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned." *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988). Because "[t]he knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record[,] * * * the reviewing court in such proceedings should be guided by the presumption that the trial court's findings were indeed correct." (Citations omitted.) *Id.*

{¶ 14} A.B.1 and A.B.2 had been in the custody of MCCS from March 8, 2019 until the permanent custody motion was filed on December 18, 2020. This 21-month timeframe was more than the requisite 12 months of a consecutive 22-month period set forth in R.C.

2151.414(B)(1)(d). Trial Tr. at 113. The trial court's analysis, therefore, focused only on whether the grant of permanent custody to MCCS was in the best interest of A.B.1 and A.B.2.

{¶ 15} When determining the best interest of the child, the court must consider all relevant factors, including those found in R.C. 2151.414(D). The trial court found the first factor particularly important – the interaction and interrelationship of the children with their parents, relatives, foster parents, and any other person who may significantly affect the child.

Interaction and interrelationships of the children

{¶ 16} The court first heard testimony from Kerri A. ("Kerri"), the foster mother of A.B.1 and A.B.2. Kerri told the court that she had been the boys' foster mother since February 2021 and that they had made great progress in the nine or ten months they had been together. Both boys, according to Kerri, were enrolled in Head Start and were reaping the benefits. "They are learning by leaps and bounds in school. * * * Being in school has really helped them tremendously." Trial Tr. at 24. The children's speech, which had been a major issue, had also improved since being placed with Kerri. She testified that "they don't mumble jumble in their own special language anymore" and that there had been a "[o]ne hundred percent improvement" in their time together. Trial Tr. at 29.

{¶ 17} Kerri also testified about the loving relationship she had developed with A.B.1 and A.B.2. She stated that both boys were "smart," "funny," and "full of life" and noted that their bond "shows in the face[s], their actions and just the way they are." Trial Tr. at 20. She further told the court that the boys were close with her extended family and

that her family saw them as "part of the family." Nakeyia Allen, Mother's caseworker, testified that the A.B.1 and A.B.2 were doing well in Kerri's care, noting that from the time A.B.1 had been with Kerri, "his speech has improved tremendously. * * * [H]e just always appears to be happy and bonded with [Kerri]." Trial Tr. at 131-132.

{¶ 18} Despite the bond with the children, Kerri admitted two things. First, she explained that while she loved A.B.1 and A.B.2, she was unsure if she was ready to adopt them. "I love them, and they love me. I mean, it's just – this is a hard decision going into. I didn't realize going into foster care that this is something that, uh, would come up so fast." Trial Tr. at 23. Kerri also acknowledged that the boys were bonded with their mother, testifying, "Every little thing that she gives them, they bring it home, and they act like she's [given] them a million dollars, and it's a simple washcloth from the dollar store. They carry it around until they go to bed." Trial Tr. at 20-21. She also noted that they talk about their older brother D.J. all the time.

{¶ 19} Notwithstanding the bond that A.B.1 and A.B.2 had with Mother and their older brother, there was troubling testimony regarding the interaction and interrelationship of the children with the older siblings that could have significantly affected them in a negative way. Allen, Mother's caseworker, disclosed that there had been allegations (which were later confirmed) that L.J. had inappropriately touched other children, including his brother, D.J. In fact, he had been removed from one foster home due to reports that he "sexually touched the son of the foster parent." Trial Tr. at 114. D.J., too, had been removed from a foster home after allegations that he "perp'd" on a five-year-old in the household.

{¶ 20} In light of L.J.'s and D.J.'s sexual abuse history, the court (along with MCCS and the guardian ad litem) expressed concern about Mother's housing plan. According to trial testimony, Mother resided in a two-bedroom apartment. If reunited with all four children, Mother planned to give L.J. his own room, and have D.J., A.B.1, and A.B.2 all sleep in a room with her. Mother also testified that she had given L.J. and D.J. boundaries as to where they could and could not go in the apartment and that they had been told they could not be left alone with A.B.1 and A.B.2. She had had several cameras installed in the home to protect the children from each other, but there were no cameras set up in L.J.'s room. MCCS feared that, due to their ages and speech limitations, A.B.1 and A.B.2 would be susceptible to abuse by their older brothers. The trial court noted that it doubted Mother could "effectively parent all her children long-term if she must also simultaneously protect them from one another." Entry at 10. While giving L.J. his own room was a strategy for sexual abuse mitigation, D.J. had also been accused of sexual abuse and would have been in the same room as A.B.1 and A.B.2. The trial court concluded that the interaction and interrelationship of the children with their parents, siblings, relatives, foster caregivers, and out-of-home providers weighed in favor of granting permanent custody to MCCS.

Need for a legally secure permanent placement

{¶ 21} The trial court was also concerned about the children's need for a legally secure permanent placement and whether that could be achieved without a grant of permanent custody to MCCS. Dr. Richard Bromberg, an expert in clinical psychology, testified that he met with Mother in December 2020 to do a clinical interview and

psychological testing. Dr. Bromberg diagnosed Mother with (1) mood disorder (disruptive mood dysregulation disorder); (2) personality disorder; (3) substance abuse disorder; and (4) "a pretty debilitating anxiety disorder, [with] a pretty classic case of panic disorder with agoraphobia." Trial Tr. at 71-72. He opined that all of these diagnoses would make it very challenging to raise A.B.1 and A.B.2, let alone all four children at once.

{¶ 22} Dr. Bromberg also administered a Child Abuse Potential Inventory. Based on Mother's score, Dr. Bromberg made several findings. First, he stated that he believed Mother had been untruthful in a lot of her answers. He also testified that "we can't rule out the existence of physical child abuse. We can't rule out neglect. We can't rule out more significant psychological impairment. We can't rule out more significant substance use and abuse." Trial Tr. at 81. Dr. Bromberg further testified that Mother's personality disorder "is very destructive * * * in a person's relationships because it involves dysfunctional * * * interpersonal skills, and * * * relationships are really interfered with. * * * [Y]ou have a lot of relationship problems all the way around." Trial Tr. at 64-65.

{¶ 23} Finally, when Dr. Bromberg was asked about his concerns with respect to Mother's ability to parent all four children, he told the court, "I think it would be unfair to the mom. * * * I think it would be unfair to the kids, * * * because it's putting everybody – it's compromising everybody." Trial Tr. at 89-90. Based on the trial testimony, the court did not believe that a secure permanent placement could be achieved without a grant of permanent custody to MCCS.

The wishes of the children

{¶ 24} As to the wishes of the children, another factor found in R.C.

2151.414(D)(1), the trial court held that due to the young ages of A.B.1 (five years old) and A.B.2 (four years old), they were unable to formulate an opinion regarding their custody, and therefore, the factor was inapplicable.

Custodial History

{¶ 25} A.B.1 and A.B.2 had been in the custody and care of MCCS for more than 12 of the preceding 22 consecutive months; A.B.1 had been two-years old and A.B.2 had been one-year old when they went into foster care, meaning they had spent most of their lives in the custody of MCCS. Additionally, the boys had been in the foster care of Kerri for approximately nine months and were thriving. The trial court, however, made no finding on this factor.

R.C. 2151.414(E) Factors

{¶ 26} The final factor the trial court must consider when determining whether granting permanent custody to the agency is in the best interest of the children is whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child. The trial court determined that there was no evidence presented relevant to these factors.

{¶ 27} After considering the requisite factors, the trial court found by clear and convincing evidence that both children had been in the temporary custody of MCCS for over 12 months of a consecutive 22-month period and that it was in the best interest of A.B.1 and A.B.2 to grant permanent custody to MCCS and divest Mother of parental rights. The trial court's decision was detailed, analyzed the requisite factors, and was reasonable. Based on our review of the record and the discussion above, we cannot say

the trial court abused its discretion.

**{¶ 28}** The assignment of error is overruled.

**III.      Conclusion**

**{¶ 29}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .


WELBAUM, P.J. and TUCKER, J., concur.