[Cite as *In re K.M.*, 2023-Ohio-3203.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
LAWRENCE COUNTY

| | | | |
|---|---|---|---|
| In the Matter of: | : | Case Nos. | 23CA9 |
| | | | 23CA10 |
| K.M. (DOB 12/29/19) | : | | 23CA11 |
| K.M. (DOB 12/29/19) | | | 23CA12 |
| K.M. (DOB 02/13/19) | : | | 23CA13 |
| K.M. (DOB 03/16/16) | | | |
| K.M. (DOB 03/09/15) | : | DECISION AND | |
| | | JUDGMENT ENTRY | |
| Adjudicated Dependent/Neglected | : | | |
| Children | | **RELEASED 8/31/2023** | |

_____

APPEARANCES:

Karyn Justice, Portsmouth, Ohio, for appellant.

Brigham M. Anderson, Lawrence County Prosecutor, and Jenna J. Waldo, Assistant Prosecuting Attorney, Ironton, Ohio, for appellee.

_____

Hess, J.

{¶1} In consolidated appeals, M.M. ("Mother"), the mother of K.M. (DOB 12/29/19), K.M. (DOB 12/29/19), K.M. (DOB 02/13/19), K.M. (DOB 03/16/16), and K.M. (DOB 03/09/15) appeals a judgment of the Lawrence County Court of Common Pleas, Juvenile Division, granting permanent custody of the children to the Lawrence County Department of Job and Family Services, Children Services Division (the "Agency"). She presents one assignment of error asserting the award of permanent custody "was against the manifest weight and sufficiency of the evidence." For the reasons which follow, we overrule the assignment of error and affirm the juvenile court's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶2}   On June 21, 2021, the juvenile court granted the Agency ex parte custody of the children.  The next day, the Agency filed complaints alleging the children appeared to be neglected and dependent.  The complaints alleged that the sheriff's department had been dispatched to the parents' home due to domestic violence, found some of the children in an upstairs bedroom which was covered in feces and locked from the outside, and found some of the children in a crib with feces on the side of it. The complaints alleged the children's father, Z.M. ("Father"), was arrested for domestic violence, and Mother was arrested for child endangerment.  The Agency sought a disposition of temporary custody.

{¶3}   The juvenile court conducted a shelter care hearing, found that reasonable efforts had been made to prevent the removal of the children, and found that it was in their best interest to remain in the Agency's temporary custody.  Subsequently, Mother and Father admitted the allegations in the complaints, and on July 8, 2021, the court adjudicated the children neglected and dependent. The court again found that reasonable efforts had been made to prevent the removal of the children and left the children in the Agency's temporary custody.  In September 2021, the court conducted a dispositional hearing, again found that reasonable efforts had been made to prevent the removal of the children, and left the children in the Agency's temporary custody.  The court adopted as its dispositional orders a case plan which had a goal of reunification and required, among other things, that the parents complete parenting and anger management classes, seek employment or resources to help provide for the children's basic needs, and maintain a safe, clean, and stable home.  The case plan also required that the parents submit to random drug screens within one hour after requested by an Agency employee, truthfully

complete substance abuse and mental health assessments, and follow all recommendations. Following the disposition, the juvenile court conducted review hearings and granted a request to add domestic violence counseling to the case plan. In September 2022, the court conducted an "annual reasonable efforts" hearing and found that the Agency was making reasonable efforts to facilitate reunification.

{¶4}   On October 20, 2022, the Agency filed a motion for permanent custody, and on January 31, 2023, the juvenile court conducted a hearing on the motion. Father consented to the court granting the Agency permanent custody. Mother opposed the Agency's motion but was not present when the permanent custody hearing began. She appeared at the hearing late via an online platform.

{¶5}   Dave Carey, the Agency employee assigned to this matter from June or July 2021 until November 2021, testified Mother made little progress on the case plan even though he made reasonable efforts to assist her. Mother completed parenting classes, but Carey could not verify that she completed any other case plan requirements. She did a substance abuse assessment but denied having a drug problem despite having positive drug screens "many times." Carey testified that Mother claimed she had false positive results due to a prescription medication, but this "was found to be not true." When Carey requested drug screens from a provider which observed specimen collection, Mother gave excuses as to why she could not go. Mother occasionally provided negative drug screens from providers she chose which did not observe specimen collection. Carey testified that he had difficulty reaching Mother by phone and probably only saw her in person ten times or less. Carey unsuccessfully attempted to visit Mother at her home in Proctorville, Ohio. He also testified that he should have seen Mother at least once a

week during visits with the children, but her attendance was inconsistent because she "could not always pass a drug test." When visits did occur, they were very chaotic due to the children's behavioral issues.

{¶6} Tina Craft, the Agency employee assigned to this matter from November 2021 until January 11, 2023, testified that at times Mother claimed to be employed, but she never complied with Craft's requests for confirmation of her employment. Craft had difficulty maintaining contact with Mother and was not able to confirm the appropriateness of her home. Craft testified that Mother was evicted from her Proctorville home. At one point, Craft was told that Mother was living in her car. At another point, Mother reported that she was staying with friends until a house was ready for her. When Mother reported that she had housing, she refused to disclose her address, stating that she was afraid Craft would disclose it to Father. Craft promised to not reveal the address to Father and explained home visits were part of the case plan, but Mother still refused to disclose her address. Craft got Mother's address from her attorney and scheduled a home visit, but Mother canceled and would not reschedule. Mother said Craft could not enter the home because there was a big, mean dog inside.

{¶7} Craft testified that Mother completed parenting and domestic violence classes and had some mental health counseling, but she never completed substance abuse counseling. During her first substance abuse assessment, Mother said she did not have a substance abuse problem even though she had several positive drug screens for methamphetamine and amphetamine. Mother did a second assessment at Craft's request but again denied any substance abuse. Craft requested another assessment, and based on the positive drugs screens, the provider felt Mother had a problem and recommended

inpatient treatment, which Mother refused. She also refused to participate in a daily intensive program. She insisted a prescription medication caused the positive screens, but personnel from Riverside Recovery and the laboratory told Craft that the results were from illegal drugs.  Craft testified that Mother had some negative drug screens, but there was suspicion that she "was doing something to alter the screens."  Mother tested positive when she did observed screens, tested negative when she did unobserved screens, and did unobserved screens even after being instructed to not do so. Mother would test positive for methamphetamine, amphetamine, and marijuana one week but negative for all substances the next week even though "marijuana does not come out of your system in a week." There were times Craft requested screens and Mother would not respond, would give a delayed response, or would give an excuse as to why she could not complete the screen.  Craft requested documentation to substantiate these excuses, but Mother never provided any.

{¶8}    In addition, Craft testified that Mother initially came to most weekly, one-hour visits with the children, which the Agency supervised.  However, the week she was supposed to start having unsupervised visits, she "no showed," and after that, she came to "maybe a couple of visits."  In June 2022, Mother had her last visit with all five children. In September 2022, she had a visit with three of the children. Mother came to no visits after that even though she would tell Craft and the children she was coming.

{¶9}    Craft testified that while this matter was assigned to her, Mother made and dropped requests for civil protection orders against Father. In addition, Mother had a pending felony charge related to the vandalism of a vehicle Father had driven to work.

While Father was making a recording of the damage, a witness to the incident gave him a description of a car which matched Mother's car.

**{¶10}** Craft believed she made reasonable efforts to help Mother complete the case plan requirements and more time would not help because Mother already had "a year and a half," and after the matter was assigned to Craft, Mother not only failed to progress but regressed. Craft testified that the children had made tremendous progress in the Agency's custody, and she feared they would regress if returned to Mother. Four of the children used to engage in self-harm, slamming their heads on the floor when they got frustrated or angry, and no longer do so. One child was basically non-verbal, had been diagnosed with autism, and would "require care for the rest of his life." His foster parents "got him in wonderful services," and he could now say short sentences. Craft testified that Mother might not know about the autism diagnosis because Craft had so little contact with her. Craft testified that the children got very upset when Mother missed visits after promising to come. The oldest child said that he did not want to see Mother anymore.

**{¶11}** C.S., foster parent for two of the children, testified that she lives in Columbus, Ohio, and that the children have been placed with her since November 2021. At that time, one child was almost three years old, and the other was five-and-a-half years old. They were not potty trained, engaged in self-harm, and their behavior with each other was erratic. The older child spoke little, and C.S. could not take him out in public due to his behavior. C.S. testified the children now participate in play therapy and go to school, the older child is using more language, and the children have a normal relationship with each other. The older child was diagnosed with autism, and C.S. was trying to obtain

additional services for him. Both children's behavior had improved, and they "go everywhere now."  C.S. and her spouse were open to adoption.

{¶12}  J.C., foster parent for two of the other children, testified that she lives in Portsmouth, Ohio, and that the children have been placed with her for almost 2 years, since they were 18 months old.  Initially, the children communicated little and banged their heads.  They received services from Help Me Grow until they turned three and were attending speech and occupational therapy.  She testified that the children had "made leaps and bounds in progress."  They speak in full sentences, say their ABCs, and exhibit normal behavior for three-year-olds.  J.C. testified that she and her spouse were open to adopting the children.  She testified that the children had "built really good bonds with their siblings" and Father, and that she was willing to continue that contact. J.C. also testified that the children had weekly phone calls with Mother which had been "consistent for a few months now."

{¶13} Mother testified that she had checked with Craft about case plan requirements, and as far as Mother knew, she had completed everything except having unsupervised visits, which she suggested was due to transportation issues.  She testified that she completed parenting classes, anger management classes, domestic violence counseling, and multiple substance abuse assessments.  Mother testified that only one assessment resulted in a diagnosis and treatment recommendation. However, the diagnosis was mild cannabis abuse, and a subsequent assessor disagreed with that diagnosis and did not recommend treatment because Mother has a medical marijuana prescription. Mother admitted that she had several drug screens which were positive for methamphetamine and amphetamine.  However, Mother testified that she had given the

Agency and court a statement from her doctor explaining that the results were caused by another prescription medication she takes and testified that a pathologist and medical review officer had agreed with her doctor. She testified that she had negative drug screens whenever she was not taking her medication. Mother admitted that she did not provide drug screens several times when Craft requested them. However, Mother testified that sometimes she had transportation issues and that she gave Craft documentation when she missed screens for other reasons.

{¶14} Mother testified that she lived in Proctorville until March 2022. From March 2022 to October 2022, she did not have an address other than staying with her grandmother "on and off" in Chesapeake, Ohio. In October 2022, she moved into a three-bedroom house in Huntington, West Virginia, which is owned by a family friend. She lives there with her dog, does not pay rent, and can stay there as long as she wants. Mother testified that she talked to Craft "on a regular basis" but was not aware that one of the children had been diagnosed with autism. Mother testified that no home visit had occurred because Craft cancelled one scheduled for December 2022 and never contacted Mother to reschedule. Mother testified that she has worked at Fazoli's since November 2022, that she told Craft about this job, and that no one from the Agency requested documentation regarding her employment. In addition, Mother testified she was late to the permanent custody hearing because Craft gave her an incorrect start time.

{¶15} Mother testified that the Agency suspended her visits in mid-July 2022 after Father was arrested for assaulting her. Mother testified that she was told the suspension would end once her injuries healed, but the suspension lasted until September or October 2022. She came to one visit after the suspension ended but then missed visits due to

transportation issues. Mother claimed she told the Agency about her transportation issues multiple times. Mother admitted that she has three vehicles but testified that they are inoperable and that she walks or takes the bus to work. Mother testified that one of her vehicles would be repaired soon. She acknowledged that she was charged with being an accessory to the destruction of Father's property but testified that the prosecutor agreed to dismiss the charge for lack of proof.

{¶16} The juvenile court conducted an in-camera interview of the oldest child. According to the juvenile court, the child had "feelings of abandonment" and "significant anger towards" Mother and liked where he was living, which was in a foster home that did not plan to adopt. The court found the other children were too young to engage in a meaningful conversation about their wishes.

{¶17} The juvenile court issued one judgment entry for all five cases granting the Agency permanent custody of the children. The court explained that it may grant a permanent custody motion if it determines that it is in the best interest of the child and determines either that the child has been in the temporary custody of a public children services agency for 12 or more months of a consecutive 22-month period (R.C. 2151.414(B)(1)(d)) or that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent (R.C. 2141.414(B)(2)). The juvenile court made each of these determinations.

## II. ASSIGNMENT OF ERROR

{¶18} Mother presents one assignment of error: "The trial court's award of permanent custody of the children to Lawrence County Children Services was against the manifest weight and sufficiency of the evidence."

## III. LAW AND ANALYSIS

### A. Standard of Review

{¶19} "A reviewing court will not reverse a trial court's judgment in a permanent custody case unless it is against the manifest weight of the evidence." *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21. We have explained:

> "To determine whether a permanent custody decision is against the manifest weight of the evidence, an appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." [*In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163,] ¶ 25, citing *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20. In reviewing evidence under this standard, we defer to the trial court's determinations of matters of credibility, which are crucial in these cases, where demeanor and attitude are not reflected well by the written record. *Eastley* at ¶ 21; *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 674 N.E.2d 1159 (1997).
>
> In a permanent custody case the dispositive issue on appeal is "whether the trial court's findings * * * were supported by clear and convincing evidence." *In re K.H.*, 119 Ohio St.3d 538, 2008-Ohio-4825, 895 N.E.2d 809, ¶ 43; R.C. 2151.414(B)(1). "Clear and convincing evidence" is "that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469, 120 N.E.2d 118 (1954), paragraph three of the syllabus; *State ex rel. Pietrangelo v. Avon Lake*, 149 Ohio St.3d 273, 2016-Ohio-5725, 74 N.E.3d 419, ¶ 14. "[I]f the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

(First alteration added.) *Id.* at ¶ 21-22.

## B.  R.C. 2151.414(B)(1)

{¶20}  The juvenile court indicated it was granting the permanent custody motion pursuant to R.C. 2151.414(B)(1), which states that a court "may grant permanent custody of a child to a movant if the court determines * * *, by clear and convincing evidence, that it is in the best interest of the child to grant permanent custody of the child to the agency that filed the motion for permanent custody" and that one of the circumstances in R.C. 2151.414(B)(1)(a) through (e) applies.  The juvenile court found R.C. 2151.414(B)(1)(d) applied, i.e., the children had "been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *."  For purposes of this provision, "a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home."  R.C. 2151.414(B)(1)(e).  In addition, when calculating whether a child has been in an agency's temporary custody for the requisite time, "the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count."  *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.  In other words, the child must be in the Agency's temporary custody for at least 12 months of a consecutive 22-month period before the Agency can move for permanent custody on R.C. 2151.414(B)(1)(d) grounds.  *Id.*

{¶21}  The children were removed from the home on June 21, 2021, and were adjudicated on July 8, 2021.  Pursuant to R.C. 2151.414(B)(1)(e), they are considered to have entered the temporary custody of the Agency on the date they were adjudicated because that date is earlier than the date that is 60 days after their removal from the

home, i.e., August 20, 2021.  Thus, when the Agency filed the permanent custody motion on October 20, 2022, the children had been in the temporary custody of the Agency for a little over 15 months.

{¶22}  Mother "agrees the children were in the temporary custody of [the Agency] for more than twelve months."  However, she asserts that when the juvenile court issued its permanent custody decision, the children had been in the Agency's custody "for only twenty months" and that "[j]ust prior to the [A]gency's decision to change the case plan goal in October 2022, the court granted Father's motion to extend the 'sunset date' to allow Mother and Father more time to complete case plan goals." Those facts are insignificant for purposes of R.C. 2151.414(B)(1)(d).  Because the children were in the Agency's temporary custody for 12 or more months of a consecutive 22-month period, R.C. 2151.414(B)(1)(d) applied, and we must affirm the permanent custody award unless the juvenile court's best interest determination is against the manifest weight of the evidence.

### C.  R.C. 2151.414(B)(2)

{¶23}  The juvenile court indicated it was also granting the permanent custody motion pursuant to R.C. 2151.414(B)(2), which states:  "With respect to a motion made pursuant to division (D)(2) of section 2151.413 of the Revised Code, the court shall grant permanent custody of the child to the movant if the court determines in accordance with division (E) of this section that the child cannot be placed with one of the child's parents within a reasonable time or should not be placed with either parent and determines in accordance with division (D) of this section that permanent custody is in the child's best interest."  R.C. 2151.414(E) states that "[i]n determining * * * whether a child cannot be

placed with either parent within a reasonable period of time or should not be placed with the parents, the court shall consider all relevant evidence."

**{¶24}** R.C. 2151.414(E) additionally states that if the court determines by clear and convincing evidence that one or more statutorily enumerated circumstances exists as to each of the child's parents, "the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent." The juvenile court did not specifically cite any of those provisions, but some of its findings implicate R.C. 2151.414(E)(1), which states: "Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home."

**{¶25}** Mother appears to challenge the applicability of R.C. 2151.414(E)(1). She directs our attention to that provision and claims that instead of making reasonable efforts to reunify the family, the Agency created obstacles to reunification. Mother asserts that the record shows she completed the case plan requirements but that the Agency failed to obtain supporting documentation even though she provided the Agency with the releases needed to obtain that documentation. She asserts that the Agency knew her substance abuse assessments did not result in a diagnosis or treatment recommendations but made her submit to repeated assessments and drug screens. Mother asserts that she has a medical marijuana card and gave the Agency documentation of the fact that another prescription medication could cause false positive

test results for methamphetamine and amphetamine, but the Agency persisted in the belief that she was using illegal drugs. She asserts that the Agency has no evidence to support this belief or its suspicion that she was "altering her drug tests," and she notes that the Agency did not offer any expert testimony to the effect that her medication could not have caused the positive test results. Mother claims the Agency acted unreasonably by denying her visitation, forcing her to choose between taking her medication and seeing her children, failing to provide transportation assistance, and not completing a home visit before the permanent custody hearing.

**{¶26}** Even if the juvenile court erred in finding that R.C. 2151.414(E)(1), and thus R.C. 2151.414(B)(2) applied, as we explained above, R.C. 2151.414(B)(1)(d) did apply. Therefore, we must affirm the grant of permanent custody unless the juvenile court's best interest determination is against the manifest weight of the evidence. Consequently, it is not necessary for us to consider whether R.C. 2151.414(E)(1), and thus R.C. 2151.414(B)(2) also applied.[1]

**{¶27}** And even if Mother's "reasonable efforts" arguments are not specific to the applicability of R.C. 2151.414(E)(1), we still do not need to address them. The Supreme Court of Ohio has held that "except for some narrowly defined statutory exceptions," the state must make reasonable efforts to reunify a family prior to a termination of parental rights, and "[i]f the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such

---

[1] Although Mother does not raise the issue, we observe that R.C. 2151.414(B)(2) applies to motions made pursuant to R.C. 2151.413(D)(2), which applies if the court makes a determination pursuant to R.C. 2151.419(A)(2), which sets forth circumstances in which the court must make a determination that "the agency is not required to make reasonable efforts to prevent the removal of the child from the child's home, eliminate the continued removal of the child from the child's home, and return the child to the child's home." Our review of the record revealed no such determination by the juvenile court.

efforts at that time." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 43. In this case, the record reflects that the juvenile court found the Agency made reasonable efforts prior to the permanent custody hearing. Thus, the juvenile court did not need to again find that the Agency made reasonable efforts before granting it permanent custody of the children. *In re F.T.*, 4th Dist. Ross No. 22CA17, 2023-Ohio-191, ¶ 71.

## D. Best Interest of the Children

**{¶28}** R.C. 2151.414(D)(1) states:

In determining the best interest of a child * * * the court shall consider all relevant factors, including, but not limited to, the following:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies * * * for twelve or more months of a consecutive twenty-two-month period * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

For the purposes of division (D)(1) of this section, a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home.

No one factor has "greater weight or heightened significance." *In re C.F.* at ¶ 57.

{¶29} Mother contends that a grant of permanent to the Agency is not in the best interest of the children.  Mother asserts that the record shows that she was "attentive to the children's educational and developmental needs while they were in her custody."  She also asserts that the children were bonded with her before the Agency suspended visits.  She maintains that she never abandoned her desire to visit and reunify with her children and that her contact with them was "sporadic in part due to" obstacles the Agency "put in place" and "her transportation issues, which she worked to address without assistance."  Mother asserts that the record demonstrates that she "can provide her children with a secure, permanent placement without the need for permanent custody to the Agency."  Mother claims that "all concerns that caused the children to be removed have been addressed and alleviated."  She asserts that she has "a home with enough bedrooms to accommodate the children," that she "is employed and can provide for the children's needs," and that she and Father are divorced. In addition, Mother maintains that the children are not placed together, that they are "separated by quite a distance geographically," and that "not all the placements are prospective adoptive placements."  She asserts that the children "are very young" and that it "is not in their best interests to be separated and placed so far apart that it [is] unlikely they will have any meaningful relationship with each other." Mother claims she "can provide them with a stable, permanent loving home together where their needs are met."

{¶30} The state suggests that we should find the permanent custody award is not against the manifest weight of the evidence based solely on the fact that the children were in the temporary custody of the Agency for 12 or more months of a consecutive 22-month period and not consider the other best interest factors.  The state directs our attention to

the fact that the Fifth District Court of Appeals has stated that it "has adopted the position that proof of temporary custody with an agency for twelve or more months of a consecutive twenty-two-month period alone is sufficient to award permanent custody" and that with such proof "a finding that grounds existed for permanent custody cannot be against the manifest weight of the evidence." *In re R.R.*, 5th Dist. Coshocton No. 2022CA0009, 2022-Ohio-3725, ¶ 40; *In re R.M.*, 5th Dist. Stark No. 2021CA00085, 2021-Ohio-4378, ¶ 36.  Alternatively, the state argues that the best interest factors collectively weigh in favor of an award of permanent custody to the Agency.

**{¶31}** In making a best interest determination, the juvenile court must "consider all relevant factors." R.C. 2151.414(D)(1).  And in reviewing the juvenile court's judgment, this court must " 'weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether in resolving evidentiary conflicts, the trial court clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered.' "  *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21, quoting *In re T.J.*, 4th Dist. Highland Nos. 15CA15, 15CA16, 2016-Ohio-163, ¶ 25.  Therefore, we will proceed to do just that and consider evidence regarding all relevant best interest factors in reviewing the juvenile court's best interest determination.

1.  Interactions and Interrelationships of the Children

**{¶32}** There is evidence that the children have bonds with their foster parents. There is also evidence they have bonds with each other despite being placed in different foster homes and have a bond with Father.  One of the foster parents expressed a willingness to help the children maintain those bonds if she adopted some of them.  There

is evidence that the children had some relationship with Mother during these proceedings. However, at the time of the permanent custody hearing, Mother had not visited the children in person for several months and had a strained relationship with the oldest child. She did continue to have phone contact with some of the children prior to the permanent custody hearing.

### 2. Wishes of the Children

**{¶33}** The juvenile court conducted an in-camera interview of the oldest child, who liked where he was living and had feelings of abandonment and significant anger towards Mother. The court found the other children were too young to engage in a meaningful conversation regarding their wishes.

### 3. Custodial History

**{¶34}** The children were evidently in the custody of Mother and Father until they were removed from the home in June 2021. They were in the Agency's temporary custody for 12 or more months of a consecutive 22-month period.

### 4. Legally Secure Permanent Placement

**{¶35}** The Ohio Revised Code does not define the phrase "legally secure permanent placement," but "this court and others have generally interpreted the phrase to mean a safe, stable, consistent environment where a child's needs will be met." *In re M.B.*, 4th Dist. Highland No. 15CA19, 2016-Ohio-793, ¶ 56. Although Mother asserts that she has a home with enough bedrooms to accommodate the children, "[a] legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *Id.*

**{¶36}** Evidence supports the juvenile court's finding that the children need a legally secure permanent placement which cannot be achieved without a grant of permanent custody to the Agency. The Agency presented evidence that the children have been thriving in the Agency's temporary custody, and foster parents to four of the children are interested in adopting them. Although Mother claims that she completed the case plan and can provide the children with a legally secure permanent placement, the juvenile court found otherwise. The juvenile court indicated it did not believe much of Mother's testimony. The juvenile court found that Mother's "residence, employment, and drug issues have not been addressed." The court found Mother's "testimony about drug tests, positive results, negative results, and explanation about invalid tests to not be an accurate account of her situation." The court also found that Mother "was given ample time and opportunity to comply with the requirements of the reunification plan" and "put forth little to no genuine effort at reunification." The court stated that Mother's "myriad of excuses for positive drug screens and lack of compliance with random screens, her attempts to negate her responsibilities, failure to provide information to case workers, failure to provide documentation for case plan compliance, her excuses about transportation, and failure to visit * * * all the children in person for the last several months cause the Court to conclude that she lacks the desire to truly work a case plan and to have the children reunified with her." The juvenile court was in the best position to judge credibility, and we defer to its credibility determinations. *In re C.S.*, 4th Dist. Pike No. 19CA899, 2019-Ohio-5109, ¶ 21.

### 5.  R.C. 2151.414(E)(7) to (E)(11) Factors

**{¶37}** The juvenile court did not find R.C. 2151.414(E)(7) to (E)(11) applied.

6.  Totality of the Circumstances

**{¶38}** Based on the foregoing, we conclude the juvenile court's best interest finding is not against the manifest weight of the evidence.  The Agency presented competent and credible evidence upon which the court reasonably could have formed a firm belief that a grant of permanent custody to the Agency was in the best interest of the children.  Accordingly, we conclude that the permanent custody award is not against the manifest weight of the evidence, overrule the sole assignment of error, and affirm the juvenile court's judgment.

JUDGMENT AFFIRMED.

## JUDGMENT ENTRY

It is ordered that the JUDGMENT IS AFFIRMED and that appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Lawrence County Common Pleas Court, Juvenile Division, to carry this judgment into execution.

Any stay previously granted by this Court is hereby terminated as of the date of this entry.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Abele, J. & Wilkin, J.: Concur in Judgment and Opinion.


For the Court



BY: _____
    Michael D. Hess, Judge




### NOTICE TO COUNSEL

**Pursuant to Local Rule No. 14, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**