[Cite as *In re D.P.*, 2024-Ohio-480.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

|  |  |  |
|---|---|---|
| IN RE: D.P., M.P., A.N.E.R. | : | |
| | : | |
| | : | C.A. Nos. 2023-CA-33; 2023-CA-36; |
| | : | 2023-CA-37; 2023-CA-38; 2023-CA-41 |
| | : | |
| | : | Trial Court Case Nos. 2019-C-00043; |
| | : | 2019-C-00044; 2019-C-00045-0C |
| | : | |
| | : | (Appeal from Common Pleas Court- |
| | : | Juvenile Division) |

. . . . . . . . . . .

O P I N I O N

Rendered on February 9, 2024

. . . . . . . . . . .

DAWN S. GARRETT, Attorney for Appellant D.P.

ROBERT ALAN BRENNER, Attorney for Appellant Father of A.N.E.R.

ANDREW BARNES, Attorney for Appellant M.P.

GARY SCHAENGOLD, Attorney for Appellant A.N.E.R.

P.J. CONBOY, II, Attorney for Appellant Mother

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . . .

EPLEY, P.J.

**{¶ 1}** Mother, Father of A.R., and children D.P., M.P., and A.N.E.R. ("A.R.") appeal from judgments of the Greene County Juvenile Court which awarded permanent custody of the children to Greene County Children Services ("GCCS"). For the reasons that follow, the judgments of the juvenile court will be affirmed.

## I.      Facts and Procedural History

**{¶ 2}** GCCS became involved with Mother and her three children (D.P., M.P., and A.R.) in the fall of 2019 when the family's home was condemned. The children were ages 10, 9, and 8, respectively, at that time. In addition to their being homeless, GCCS had concerns about Mother's drug use (she tested positive for amphetamine, methamphetamine, and marijuana), her unemployment, and the children's truancy. As a result, on December 3, 2019, GCCS filed complaints alleging that the children were neglected and dependent pursuant to R.C. 2151.03 and R.C. 2151.04. A shelter care hearing was held, and GCCS was granted interim temporary custody of all three children.

**{¶ 3}** On January 14, 2020, the children were adjudicated as dependent, but the magistrate dismissed the neglect allegations. D.P., M.P., and A.R. were then placed in the temporary custody of GCCS. To facilitate the reunification of the family, Mother was given a case plan with the following objectives: (1) obtain safe and suitable housing; (2) successfully complete substance abuse evaluation and classes; (3) complete a mental health evaluation; (4) submit to random drug screens as requested; (5) keep contact with the caseworker to discuss progression on the case plan at least once a month and meet with the caseworker once a month; (6) sign releases of information; (7) abide by the visitation plan set forth by the agency and caregivers; and (8) respect phone call privileges

with children and have appropriate conversations. February 18, 2020, Report and Recommendation of GAL. The plan was modified shortly thereafter to also include the completion of parenting classes.

{¶ 4} On March 9, 2021, the parties agreed that it was in the best interest of the children to extend temporary custody to GCCS. A second such extension was agreed upon and granted on June 3, 2021.

{¶ 5} On November 23, 2021, GCCS filed motions requesting modification of temporary custody to permanent custody. The trial date was originally set for spring 2022 but was delayed because Mother filed a motion for reunification and continuances were granted to find alternative placements, locate one of the fathers, and appoint an attorney on behalf of the children (as the wishes of two of them differed from the GAL's recommendation). The trial was eventually scheduled for February 7-8, 2023. Prior to the trial, however, GCCS filed two additional motions: (1) a motion requesting modification of temporary custody of D.P. and A.R. to legal custody to Shane Elam, Mother's boyfriend, and (2) a motion requesting modification of temporary custody of M.P. to legal custody to Kali M., whose oldest child is M.P.'s cousin.

{¶ 6} At the trial on February 7, 2023, the court heard testimony from Tamara Roddy, D.P.'s therapist; Kali M., M.P.'s foster mother; and Hayley Fannin, the caseworker for all three children. The parties gathered again the following day, and it was expected that Elam would testify regarding the motion to grant him legal custody of the children. He did not appear, however, and the court was notified that he was removing himself from consideration as legal custodian. GCCS officially withdrew its motion as to Elam, and the

court was left to decide if permanent custody should be granted to GCCS.

{¶ 7} The final day of the trial was held on April 17, 2023. At the beginning of the proceedings, Mother's attorney made an oral motion to reconsider Elam as legal custodian – this time for all three children – as Kali M. was no longer interested in being legal guardian of M.P. Resultantly, GCCS withdrew its motion to grant Kali M. legal custody of M.P.

{¶ 8} After the initial motions, the trial court heard testimony from Fannin, who returned to the stand, Libby Powers from the Green County Family Visitation Center, Elam, and Tasha Mills, the guardian ad litem (GAL). Dozens of exhibits were presented for the court's consideration. Finally, on June 11 and 12, the trial court granted permanent custody of all three children to GCCS, finding that they had been in the temporary custody of GCCS for 12 or more months of a consecutive 22-month period and that permanent custody was in the best interest of the children.

{¶ 9} Mother, Father of A.R., D.P., M.P., and A.R. have all filed appeals. The father of D.P. and M.P. did not participate below and did not file an appeal.

## II.     Legal Custody

{¶ 10} All the appellants argue that the trial court erred by not granting legal custody of the children to Shane Elam, Mother's boyfriend.

{¶ 11} If a child is adjudicated a "dependent child," the court may grant legal custody of the child "to either parent or to any other person who, prior to the dispositional hearing, files a motion requesting legal custody of the child[.]" R.C. 2151.353(A)(3); *In re M.W.*, 2d Dist. Montgomery No. 28440, 2019-Ohio-5012, ¶ 5. An award of legal custody gives the custodian the right to have physical care and control of the child, to determine where the

child lives, "and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all subject to any residual parental rights, privileges, and responsibilities." R.C. 2151.011(B)(21).

{¶ 12} The custody determination under R.C. 2151.353 must be made in accordance with the "best interest of the child" standard described in R.C. 3109.04(F)(1). The factors which must be considered include things like the "parents' wishes; the child's wishes, if the court has interviewed the child; the child's interaction with parents, siblings, and other who may significantly affect the child's best interest; adjustment of the child to home, school, and community; and the mental and physical health of all involved persons." R.C. 3109.04(F)(1); *In re M.J.S.*, 2d Dist. Montgomery No. 29292, 2022-Ohio-1114, ¶ 9.

{¶ 13} "[W]hen determining whether or not to grant an individual or couple legal custody of a dependent child, a court can do so if it finds by a preponderance of the evidence that it is in the best interes[t] of the concerned child. Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " (Citations omitted.) *In re A.W.*, 2d Dist. Montgomery No. 21309, 2006-Ohio-2103, ¶ 6, citing *In re K.S.*, 2d Dist. Darke No. 1646, 2005-Ohio-191, ¶ 15. *Accord In re C.B.*, 2d Dist. Montgomery No. 28113, 2019-Ohio-890, ¶ 17.

{¶ 14} We apply the abuse of discretion standard of review to a trial court's judgment on a motion for legal custody and will not reverse absent an abuse of that discretion. *In re G.D.*, 2023-Ohio-1913, 216 N.E.3d 775, ¶ 10 (2d Dist.). Abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*,

5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶ 15} Based on the record in this case, we cannot conclude that the trial court abused its discretion when it failed to grant legal custody of the children to Elam. First, there is a procedural issue that would prevent Elam from being granted custody. To be granted legal custody of child, a person (who is not the parent) who has filed a motion requesting legal custody or who is identified in a complaint or motion must sign a "statement of understanding" that custody is intended to be permanent, that he or she assumes legal responsibility for the care and supervision of the child and the person must be present in court. R.C. 2151.353(A)(3)(a)-(d); *In re C.P.*, 2d Dist. Clark No. 2017-CA-48, 2018-Ohio-1862, ¶ 16.

{¶ 16} While it is arguable that Elam was identified in a motion for legal custody (though it was withdrawn when he failed to appear for the February 8 date) and was present in court (Elam failed to show for the February 8 hearing but did take the stand in April 2023), he did not sign the "statement of understanding." This non-compliance disqualified him from becoming the legal guardian of the children. *See In re L.T.*, 8th Dist. Cuyahoga No. 110676, 2022-Ohio-1586, ¶ 55 (holding that the requirement of signing a "statement of understanding" applies to non-parents who seek to obtain legal custody); *In re R.K.*, 5th Dist. Muskingum No. CT2012-0006, 2012-Ohio-2739, ¶ 23 ("We read the statute as providing for a grant of legal custody to either a parent, or, in the alternative, to any other person who files a motion for legal custody *and a statement of understanding*." (Emphasis added.)).

{¶ 17} But even if that were not the case, the trial court's decision was not an abuse

of discretion. In considering whether granting Elam legal custody was in the best interest of the children, the trial court was troubled by his apparent indecision about if he even wanted to be their custodian. The court noted:

> [Mother's] current boyfriend, Shane Elam, initially advised Children Services he would accept custody of the children. However, he failed to follow through with this, despite the children exercising visitation at his home in the past. He also failed to sign the Statement of Understand presented to him by Children Services agreeing to assume custody of the children. He failed to appear for hearing on February 7, 2023, so the matter of custody was continued to February 8, 2023 to permit Mr. Elam to once again appear for court. However, on this date the court was advised that Mr. Elam no longer wished to be considered as the legal custodian.

Judgment Entry & Orders of Permanent Custody at 5. And even though he testified at the April trial date that he was willing to take custody of all three children, his reason for missing the first dates were incongruent.

{¶ 18} According to Elam's testimony, he missed the first days of trial because he could not remember about them. Elam told the court that in November 2022 he suffered a head injury due to an accident. "I had an accident at work in November, fell 15 feet and landed on my head, two factures, major concussion, been kind of out of it." Day 2 Trial Tr. at 186-187. Later, during cross-examination, he testified that he could not recall why he did not show up for the February hearings. Day 2 Trial Tr. at 195, 202-203. Further, Elam stated that he had not worked since the accident (although he had been paid) and that his medical

prognosis was still unclear.

{¶ 19} Based purely on the medical concerns surrounding Elam and his memory issues, it was reasonable for the trial court to conclude that making him the legal custodian was not in the best interest of D.P., M.P., and A.R. The trial court did not abuse its discretion, and the assignments of error as to Elam are overruled.

{¶ 20} In addition to arguing that Elam should have been granted legal custody, M.P. also avers that Mother's 21-year-old sister, Aunt, should have been named legal custodian. This argument is unavailing as well because Aunt neither filed for legal custody nor signed a "statement of understanding," failing to meet the requirements set forth in R.C. 2151.353(A)(3)(a)-(d). The trial court did not abuse its discretion and the assignment of error as to Aunt is overruled.

## III.    Permanent Custody

{¶ 21} Most of the appellants also claim that it was an error for the trial court to grant permanent custody to GCCS.

{¶ 22} The United States Supreme Court has described parents' interest in the care, custody, and control of their children as "perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). This interest, however, is not absolute. "The state has broad authority to intervene to protect children from abuse and neglect." *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Prob. Div.*, 150 Ohio St.3d 230, 2016-Ohio-7382, 81 N.E.3d 380, ¶ 58 (O'Connor, C.J., dissenting).

{¶ 23} R.C. 2151.414 sets forth a two-part analysis for courts to consider when

determining a motion for permanent custody to a public services agency. First, the trial court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with the parent within a reasonable time; (b) is abandoned; (c) is orphaned with no relatives above to take permanent custody; or (d) has been in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. *In re I.W.*, 2d Dist. Clark No. 2019-CA-76, 2020-Ohio-1643, ¶ 20; R.C. 2151.414.

{¶ 24} If the first prong is met, the court must then determine whether granting permanent custody is in the best interest of the child. *In re J.N.*, 2d Dist. Clark No. 2019-CA-82, 2020-Ohio-4157, ¶ 26; R.C. 2151.414(B)(1). To help with this determination, R.C. 2151.414(D)(1) sets out factors the court must consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child * * *;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of this section apply in relation to the parents and child.

"No one element is given greater weight or heightened significance." *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 57.

{¶ 25} D.P., M.P., and A.R. had been in the custody of GCCS from December 3, 2019, until the permanent custody motion was filed on November 23, 2021. This 23-month timeframe was far more than the requisite 12 months of a consecutive 22-month period set forth in R.C. 2151.414(B)(1)(d). The trial court's analysis, therefore, focused only on whether the grant of permanent custody to GCCS was in the best interest of the children.

Interaction and interrelationships of the children

{¶ 26} The trial court found, and the record confirms, that the children's relationship with one another was "contentious." During visits at the Greene County Family Visitation Center, the children's behavior toward each other was sometimes problematic. For instance, at a June 2021 visit, D.P. locked his sister, A.R., in a storage shed and verbalized inappropriate and hostile language towards\ his siblings, especially A.R., whom he called a racial slur. Hayley Fannin, the family's caseworker, testified that sisters M.P. and A.R. were originally placed together in a foster home, but were quickly separated because they could not get along, and once M.P. was placed in a foster home without her sister, things did not get better. Fannin testified A.R. had been exhibiting "erratic behavior," cussing out and hitting other kids in the foster home. She further explained that A.R. had been suspended multiple times from school, so "her behaviors are just off the chart right now." Day 1 Trial Tr. at 44.

{¶ 27} D.P. had also had poor behavior according to Fannin. He was placed in a residential treatment center after he ran away from two different group homes, including

one time where he was gone for 22 days. M.P. also struggled. Kali Mills, who had originally asked for legal custody of M.P., withdrew the request in March 2023 citing increased behavioral problems and the inability to get along with the other children in the home.

{¶ 28} The children had little to no relationships with their fathers. A.R.'s father was serving a lengthy prison sentence at the time of trial and refused to be transported for trial. D.P. and M.P. had minimal contact with their father, who failed to cooperate with GCCS despite repeated requests. In fact, he had only one happenstance contact with the children during the pendency of the case.

{¶ 29} Finally, while the children's relationships with each other, their fathers, and their foster providers were strained, testimony indicated that all three loved their mother and got along well with her.

Wishes of the Children

{¶ 30} The next consideration is the wishes of the children. The trial court conducted in camera interviews with all three children, and D.P. and M.P. expressed clear interest in being with Mother. A.R. stated that she wanted to be with family, but also told the court that she would be willing to be adopted by her foster mom.

Custodial History

{¶ 31} All three children had been in the custody of GCCS since December 2019 and lived in multiple foster homes or residential facilities during that time.

Need for Legally Secure Permanent Placement

{¶ 32} While the Ohio Revised Code does not define what a "legally secure permanent placement" is, Ohio courts have held that the phrase means "a safe, stable,

consistent environment where a child's needs will be met." *In re K.M.*, 4th Dist. Lawrence Nos. 23CA9, 23CA10, 23CA11, 23CA12, 23CA13, 2023-Ohio-3203, ¶ 35. The trial court found, and the evidence confirms, that Mother would have a difficult time providing such an environment for her children.

{¶ 33} The trial court believed that Mother had failed to take meaningful steps to regain custody of her children. The evidence relating to her case plan illustrated this. First, visitations with the children at the Greene County Visitation Center were inconsistent for Mother. Between November 22, 2021, and February 25, 2022, 11 visits were scheduled; Mother no-showed for five. From June 2, 2022, through November 16, 2022, Mother had 24 scheduled visits; she cancelled two ahead of time and no-showed another five. In addition, Mother accrued three behavior violations for being hostile to staff.

{¶ 34} Mother also failed to obtain housing. While it was confirmed that Mother had lived for approximately a year with Elam, except for a two-month period in 2021 (before she was evicted), she had not secured independent housing since January 2020. Fannin testified that Mother mostly stayed with friends and paramours.

{¶ 35} Drug testing was also a problem. According to Fannin, "[w]henever [Mother] is asked to submit to a random drug screen, it's typically a fight or there are some words between her and myself that she just will not take it[.]" Day 2 Trial Tr. at 38. When Mother did submit to the tests, she was typically positive for THC.

{¶ 36} Mental health counseling was also questionable. Fannin testified that Mother got the initial assessment completed in November 2020, but did not set up further classes that were recommended. And while Mother claimed to have been in counseling, Fannin

testified that she had not been provided any names, numbers, or paperwork to verify, leading her to believe that Mother had not seen a therapist since at least the summer of 2022.

{¶ 37} Fannin told the court, in summary, that "[a]t this time [Mother] has not demonstrated to the agency that she is capable of caring for three kids who are teenagers, and she has not completed anything on her case plan." Day 2 Trial Tr. at 50. She went on to note that there is nothing showing that her "mental health is in check, that she's not smoking weed, and that she is overall stable at this time." *Id.* The GAL reported concerns as well. Mother's "struggles with providing and caring for the children, notably the inability to have a home or job when paired with the opinions of the majority of the professionals involved in the children's lives, gives rise to great concern with Mother being granted return custody of the children."

{¶ 38} Mother notes, however, that Tamara Roddy, D.P.'s counselor, testified that Mother had been involved in her son's treatment and that D.P. was "very bonded to his mother and talks to her every day." Day 1 Trial Tr. at 13. Roddy also opined that it "would not be a good thing for him [to be placed with someone else] because he's very bonded to his mom * * * and she's been an integral part in him wanting to get better[.]" Day 1 Trial Tr. at 19.

{¶ 39} Because awarding permanent custody is a "drastic remedy that involves the termination of parental rights, permanent custody determinations must be based upon clear and convincing evidence." *Id.* (Citations omitted.) "Clear and convincing" means more than a preponderance, but less than "clear and unequivocal." *In re Rose*, 2017-Ohio-694, 85

N.E.3d 498, ¶ 19 (2d Dist.). Because R.C. 2151.414 mandates that a juvenile court find by clear and convincing evidence that the statutory requirements are met, the sufficiency of the evidence and/or manifest weight standards of review are the proper appellate standards of review depending on the arguments presented by the parties. *In re Z.C.*, Ohio Slip Opinion No. 2023-Ohio-4703, __ N.E.3d __, ¶ 11; *In re Ca.S.*, 4th Dist. Pickaway No. 21CA10, 2021-Ohio-3874, ¶ 44 (a reviewing court will not disturb a trial court's permanent custody decision unless it is against the manifest weight of the evidence).

{¶ 40} When an appellate court reviews whether the lower court's permanent custody decision is against the manifest weight of the evidence, it "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the [finder of fact] clearly lost its way and created such a manifest miscarriage of justice that the [judgment] must be reversed and a new trial ordered." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 20, quoting *Tewarson v. Simon*, 141 Ohio App.3d 103, 115, 750 N.E.2d 176 (9th Dist.2001). "Thus, if the children services agency presented competent and credible evidence upon which the trier of fact reasonably could have formed a firm belief that permanent custody is warranted, then the court's decision is not against the manifest weight of the evidence." *In re R.M.*, 2013-Ohio-3588, 997 N.E.2d 169, ¶ 55 (4th Dist.).

{¶ 41} The trial court heard testimony that, despite the fact that Mother and her children were bonded, she had no job, had no home of her own (she lived with various friends, family, and lovers), she missed many visitation opportunities with the children, she failed to complete therapy, and she continued to use drugs. The GAL had "great concern"

with Mother getting custody back.

{¶ 42} Other family members were not placement options either. The fathers of the children were either incapable (in the case of A.R.'s father, who is in prison until the 2040s) or unwilling (in the case of D.P. and M.P.'s father, who has no contact with them) to raise the children. And despite reasonable efforts from GCCS, extended family placements did not come to fruition either.

{¶ 43} Based on the record before us, the trial court's decision granting permanent custody to GCCS was not against the weight of the evidence.

{¶ 44} The Ohio Supreme Court has held that "sufficiency is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997). It is essentially a test of adequacy: whether the evidence is legally sufficient to sustain a verdict is a question of law. *Id.* When applying a sufficiency standard, a reviewing court should affirm when the evidence is legally sufficient to support the verdict as a matter of law. *In re Z.C.* at ¶ 13.

{¶ 45} "Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a conviction is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency." (Citations omitted.) *State v. McCrary*, 10th Dist. Franklin No. 10AP-881, 2011-Ohio-3161, ¶ 11; *accord State v. Winbush*, 2017-Ohio-696, 85 N.E.3d 501, ¶ 58 (2d Dist.). As a result, "a determination that a conviction is supported by the weight of the evidence will also be dispositive of the issue of sufficiency." (Citations omitted.) *State v.*

*Braxton*, 10th Dist. Franklin No. 04AP-725, 2005-Ohio-2198, ¶ 15.

**{¶ 46}** Having already found that the trial court's decision to grant permanent custody of the children to GCCS was supported by the weight of the evidence, we must also conclude that it is supported by sufficient evidence. Therefore, appellants' assignments of error pertaining to those concepts are overruled.

### IV.    Conclusion

**{¶ 47}** The judgments of the trial court will be affirmed.

. . . . . . . . . . . . .

WELBAUM, J. and HUFFMAN, J., concur.